## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **RONALD BAKER,** | ) | |
| 9201 McGee | ) | |
| Kansas City, Missouri 64114, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: |
| | ) | |
| **MISSION CHATEAU, L.L.C.,** | ) | **JURY TRIAL DEMANDED** |
| (Serve Resident Agent: | ) | |
| Michael F. Flanagan | ) | |
| 14005 Outlook | ) | |
| Overland Park, Kansas 66223), | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **TUTERA SENIOR LIVING &** | ) | |
| **HEALTH CARE, L.L.C.,** | ) | |
| (Serve Resident Agent: | ) | |
| Michael F. Flanagan | ) | |
| 14005 Outlook | ) | |
| Overland Park, Kansas 66223), | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **TUTERA HEALTH CARE SERVICES,** | ) | |
| **L.L.C.,** | ) | |
| (Serve Resident Agent: | ) | |
| Michael F. Flanagan | ) | |
| 14005 Outlook | ) | |
| Overland Park, Kansas 66223), | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **TUTERA GROUP, INC.,** | ) | |
| (Serve Resident Agent: | ) | |
| Michael F. Flanagan | ) | |
| 14005 Outlook | ) | |
| Overland Park, Kansas 66223), | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Ronald Baker states the following as his causes of action against Defendants Mission Chateua, L.L.C., Tutera Senior Living & Health Care, L.L.C., Tutera Health Care Services, L.L.C., and Tutera Group, Inc.

1.     Plaintiff Ronald Baker is an African American, male resident of Kansas City, Jackson County, Missouri.

2.     Defendant Mission Chateau, L.L.C. is a Kansas limited liability company that conducts business in Johnson County, Kansas.

3.     Defendant Mission Chateau, L.L.C. is an employer as defined and within the meaning of 42 U.S.C. § 2000e(b) of Title VII of the Civil Rights Act of 1964 as amended in 1991.

4.     Defendant Tutera Senior Living & Health Care, L.L.C. is a Kansas limited liability company that conducts business in Johnson County, Kansas.

5.     Defendant Tutera Senior Living & Health Care, L.L.C. is an employer as defined and within the meaning of 42 U.S.C. § 2000e(b) of Title VII of the Civil Rights Act of 1964 as amended in 1991.

6.     Defendant Tutera Health Care Services, L.L.C. is a foreign limited liability company that conducts business in Johnson County, Kansas.

7.     Defendant Tutera Health Care Services, L.L.C. is an employer as defined and within the meaning of 42 U.S.C. § 2000e(b) of Title VII of the Civil Rights Act of 1964 as amended in 1991.

8.     Defendant Tutera Group, Inc. is a foreign corporation that conducts business in Johnson County, Kansas.

2

9.      Defendant Tutera Group, Inc. is an employer as defined and within the meaning of 42 U.S.C. § 2000e(b) of Title VII of the Civil Rights Act of 1964 as amended in 1991.

10.     Plaintiff is bringing these claims pursuant to Title VII of the Civil Rights Act of 1964, as amended in 1991, 42 U.S.C. § 2000 et seq., and 42 U.S.C. § 1981.

11.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332.

12.     Venue is proper because a substantial part of the events or omissions giving rise to the claim occurred in Johnson County, Kansas in the District of Kansas within the meaning of 28 U.S.C. § 1391(b).

13.     Plaintiff filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) alleging that Defendants engaged in the discriminatory and/or retaliatory actions that are being raised in this lawsuit, or alternatively, the allegations of Plaintiff's lawsuit would have arisen from the investigation of Plaintiff's Charge of Discrimination.

14.     Notices of Right to Sue have been issued by the EEOC, and this action is being brought within ninety (90) days from the issuance of such Notices of Right to Sue.

15.     Plaintiff has fulfilled all conditions precedent to the bringing of this claim and has duly exhausted all administrative procedures in accordance with the law prior to instituting this lawsuit.

## ALLEGATIONS COMMON TO ALL COUNTS

16.     From approximately September 25, 2019 to April 30, 2020,  Plaintiff worked as a Certified Nursing Aide (CNA) and/or a Certified Medication Aide (CMA) at Mission Chateau, a senior living community in Prairie Village, Kansas with apartment homes for independent living, memory care, and assisted care.

17.     Mission Chateau is part of what is known as the "Tutera Family Communities."

18.     Mission Chateau is listed as one of the senior living community locations on the website www.tutera.com.

19.     Defendant Mission Chateau, L.L.C. is owned and/or operated by Defendants Tutera Senior Living & Health Care, L.L.C.,  Tutera Health Care Services, L.L.C., and/or Tutera Group, Inc.

20.     At the time of Plaintiff's employment, Defendants Mission Chateau, L.L.C. and Tutera Senior Living & Health Care, L.L.C., Tutera Health Care Services, L.L.C., and/or Tutera Group, Inc.'s operations were interrelated, there was common management, there was centralized control of labor relations, and/or common ownership or financial control, including, but not limited to the following:

a.     Defendants Mission Chateau, L.L.C., Tutera Senior Living & Health Care, L.L.C., Tutera Health Care Services, L.L.C., and/or Tutera Group, Inc. all share the same registered agent and organizer, Michael F. Flanagan.

b.     Defendants Mission Chateau, L.L.C., Tutera Senior Living & Health Care, L.L.C., Tutera Health Care Services, L.L.C., and/or Tutera Group, Inc. all share the same registered office, 14005 Outlook, Overland Park, Kansas 66223.

c.     Defendants Tutera Senior Living & Health Care, LLC, Tutera Health Care Services, L.L.C., and/or Tutera Group, Inc. share the same mailing address registered with the Kansas Secretary of State, 7611 State Line Road, Suite 301, Kansas City, Missouri 64114.

d.     According to https://missionchateaubytutera.com, "Mission Chateau is a rental-based community showcasing extraordinary hospitality and services for independent living,

4

assisted living, and memory care. Residents also have priority access to Tutera Senior Living & Health Care's full complement of post-acute health care services, including Home Health and Rehabilitation and Extended Stay."

       e.      Defendants Tutera Senior Living & Health Care, L.L.C., Tutera Health Care Services, L.L.C., and/or Tutera Group, Inc. provided workplace policies and/or forms to Mission Chateau and/or Defendant Mission Chateau, L.L.C.

       f.      Defendants Tutera Senior Living & Health Care, L.L.C., Tutera Health Care Services, L.L.C., and/or Tutera Group, Inc. provided human resource services to Mission Chateau and/or Defendant Mission Chateau, L.L.C.

       g.      Defendants Tutera Senior Living & Health Care, L.L.C., Tutera Health Care Services, L.L.C., and/or Tutera Group, Inc. responded to complaints of workplace discrimination made by employees working at Mission Chateau and/or Defendant Mission Chateau, L.L.C.

       h.      Defendants Tutera Senior Living & Health Care, L.L.C., Tutera Health Care Services, L.L.C., and/or Tutera Group, Inc. provided training to employees working at Mission Chateau and/or Defendant Mission Chateau, L.L.C.

       i.      Defendants Mission Chateau, L.L.C. and Tutera Senior Living & Health Care, L.L.C., Tutera Health Care Services, L.L.C., and/or Tutera Group, Inc. shared common management.

       j.      Defendants Mission Chateau, L.L.C. and Tutera Senior Living & Health Care, L.L.C., Tutera Health Care Services, L.L.C., and/or Tutera Group, Inc. transferred residents from one facility to another.

21.     When Plaintiff first began working at Mission Chateau, the Director of Nursing was Pamela Eickhoff (Eickhoff), a Caucasian female, and the Assistant Director of Nursing was Annie Debo (Debo), a Caucasian female.

22.     In or around October 2019, Eickhoff resigned, and Tanya Leaming (Leaming), a Caucasian female, became the new Director of Nursing.

23.     After Leaming was hired, she changed Plaintiff's responsibilities so he was working only as a CMA from 3pm to 11pm.

24.     Prior to this change, Plaintiff worked from 3pm to 7pm as a CNA and from 7pm to 11pm as a CMA.

25.     In around the middle of December 2019, Debo resigned from her Assistant Director of Nursing position, and Allison Hislop (Hislop), a Caucasian female, took over as the Assistant Director of Nursing.

26.     Under Leaming and Hislop's supervision, as well as under the leadership of Executive Director Mary Margaret Tutera Cunningham (known as Peaches), Plaintiff believes that he has been subjected to different terms and conditions of employment and disparate treatment based on his race/color and subjected to a hostile and offensive work environment based on his race/color, which Plaintiff found and a reasonable person would find to be offensive.

27.     For instance, Caucasian employees were allowed to stand around talking, take personal calls, put their feet up on furniture, arrive late to work, etc., but black and/or African American employees were reprimanded for engaging in the same or similar behavior.

28.     In or around March 4, 2020, Plaintiff arrived at work and saw Hislop sitting at her computer.

6

29.     Plaintiff heard Jay (Plaintiff believe his last name is Matney), the Head of Maintenance, ask Hislop if she was ready to go smoke.

30.     Jay then joked that he did not have any of the "good stuff."

31.     Hislop responded and told Jay that if she wanted the good stuff she would go to "him," and she pointed at Plaintiff.

32.     Plaintiff asked Hislop what she meant.

33.     Hislop replied that she was "not stupid" and that she has a nose.

34.     Plaintiff told Hislop that he did not know what she was talking about and told her that he was not stupid either.

35.     Plaintiff felt like Hislop assumed he used and/or sold marijuana or other illegal drugs because he was black and/or African American.

36.     The next day, on or around March 5, 2020, Plaintiff was called into the office.

37.     Miles Nease (Nease), the Executive Director for Assisted Living and Memory Care at Mission Chateau, told Plaintiff that he had not been acting himself lately and that he was going to be drug tested.

38.     Nease then asked Plaintiff if he could be discrete.

39.     Plaintiff took the plastic cup Nease handed him and went into the bathroom to give a urine sample.

40.     When Plaintiff walked out of the bathroom, Leaming was waiting for him and took his sample from him.

41.     Plaintiff went back into Nease's office, and Nease asked him to sign a document.

42.     Plaintiff was hesitant to sign the document since it was not completely filled out, but he went ahead and signed.

43.     Nease told Plaintiff he was suspended without pay until the results of his drug test came back.

44.     Approximately a week and one-half later, Leaming called to let Plaintiff know that his drug test came back clean, and he could return to work.

45.     Plaintiff was not surprised that his test results came back negative because he does not use marijuana or any other illegal drugs.

46.     Plaintiff returned to work on March 14, 2020.

47.     As Plaintiff was walking into work, he saw Hislop.

48.     Hislop said hello, but Plaintiff did not respond.

49.     Plaintiff saw his co-worker Nick (Plaintiff believes his last name is Cox), a Caucasian maintenance employee, and Plaintiff told him that his test results came back clean and that those "niggas" were messing with him, i.e. trying to get Plaintiff fired.

50.     On or about March 17, 2020, Plaintiff received a call from a woman who identified herself as being with Tutera's corporate office.

51.     Plaintiff does not recall the woman's name, but he believes her name was Mary and/or Marilyn.

52.     Mary/Marilyn informed Plaintiff that Hislop had reported that he called her a "bitch," that he had used the word "niggas" in reference to her, and that Plaintiff did not tell her hello.

8

53.     Plaintiff told Mary/Marilyn that he did not call Hislop a "bitch" and told Mary/Marilyn about his conversation with Nick.

54.     Plaintiff told Mary/Marilyn that Nick could confirm that what Plaintiff was telling her was true.

55.     Plaintiff believes Nick did talk to Mary/Marilyn and confirmed their conversation had occurred as Plaintiff stated.

56.     During the call, Mary/Marilyn told Plaintiff she was African American, and she found his use of the word "niggas" racist.

57.     Plaintiff told Mary/Marilyn that he believed that the word "niggers" was racist, but his use of the word "niggas" was not.

58.     Plaintiff felt he had been singled out for a drug test because of his race/color, and Plaintiff told Mary/Marilyn that he felt discriminated against and harassed at work because of his race/color.

59.      Plaintiff reported to Mary/Marilyn that he felt black/African Americans, like himself, were treated differently (less favorably) than Caucasian employees at work.

60.     Plaintiff felt this different, more negative treatment, began after Leaming took over as the Director of Nursing.

61.     Mary/Marilyn did not ask Plaintiff for further details, but she told him she would find out more information from him and conduct an investigation.

62.     Plaintiff never heard anything back from Mary/Marilyn (or anyone else) about his report of discrimination and harassment.

63.     Approximately a week or two later, Plaintiff was called into a meeting with Nease and Leaming.

64.     Nease and Leaming told Plaintiff he was being written up for using the word "niggas" at work.

65.      They asked him to provide a statement.

66.     Plaintiff told them that he had already provided a statement to corporate and that Mary/Marilyn told him she was going to investigate this situation further.

67.     Plaintiff questioned why he was being written up before the investigation was concluded.

68.     Nease and Leaming issued Plaintiff the write-up anyway.

69.     On or about April 20, 2020, a Caucasian female named Lauren (last name unknown) was telling Plaintiff she received a $2 per hour raise in her new position as a CMA.

70.      Prior to becoming a CMA, Lauren had been working at Mission Chateau as a CNA.

71.     Shortly after Lauren shared this information with Plaintiff, Plaintiff went to talk to Leaming and told her that he felt underpaid as a CMA.

72.     Leaming asked him how much he made per hour, and he told her his hourly rate of pay was $14.50.

73.     Leaming told Plaintiff he should be at $15.50 per hour, and she told him she would see about getting his pay increased.

74.     On or about April 13, 2020, as Plaintiff was getting ready to clock into work, Leaming stopped him and took him to Nease's office.

75.     Nease told Plaintiff he was being suspended without pay while they conducted an investigation.

76.     Nease did not tell Plaintiff what they were investigating or provide him any other information during their meeting.

77.     On or about April 29, 2020, Plaintiff met with Nease and Leaming. During this meeting, Plaintiff was handed a document with a list of allegations made against him which stated:

"Ron Allegations

-Incident on 4/22. "Spend less time on his cell phone so he can stop throwing me around" Rough with resident. Threw resident on the toilet. Has done this multiple other times. Resident never informed anyone because he was afraid of retaliation by the associate.

-Incident several weeks ago. Refused to assist compromised resident by forcing resident to wheel themselves through the doorway of their apartment. This upset the resident because the resident has had a history of getting skin tears by banging their hands on the door frame when self-propelling. Afterword, the resident felt like associate was mocking them saying repeatedly "Thank you very much" multiple times with a very sarcastic tone of voice. This resident told us that they dread it when the associate comes into their apartment.

-Numerous staff and residents interviewed stated that associate is on his phone while dispensing medications or providing cares. This occurs on the med carts when he is popping pills as well as in the residents' apartment when associate is dispensing pills or providing cares.

-Several staff and residents indicated that they never informed Management about the situation for fear of being retaliated against by the associate. A couple of residents said they did not want anything to happen to them, so they never reported their concerns. Staff, including supervisors, said that associate has a temper and felt threatened. One co-worker said they "walk on egg shells around associate for fear of upsetting him and making the associate angry."

78.     Nease and Leaming asked Plaintiff to write a statement in response to these allegations.

79.     In his statement, Plaintiff denied that he had abused any residents and explained that there were other employees, i.e. John and Lauren, who witnessed his interactions with these residents who could confirm that these allegations were untrue.

11

80.     Other than answering his cellular telephone for work related matters, Plaintiff also denied being on his cellular telephone for personnel reasons while dispensing medication and/or providing care to the residents.

81.     The next day, on or about April 30, 2020, Leaming told Plaintiff that he was fired.

82.      Before making the decision to fire Plaintiff, it is Plaintiff's understanding that Leaming and Nease did not speak to the employees who were witnesses to his interactions with the residents.

83.     Plaintiff believes he was fired in retaliation for his complaints of discrimination and harassment based on his race/color and/or because of his race/color.

84.     Since Leaming became the Director of Nursing, it is Plaintiff's understanding that a number of employees have reported race discrimination/harassment and have been retaliated against for making these reports.

## COUNT I – RETALIATION IN VIOLATION OF TITLE VII AND 42 U.S.C. §1981

85.     Plaintiff hereby incorporates by reference into Count I all allegations contained in all preceding paragraphs herein.

86.     As set forth above, Plaintiff engaged in protected activity, including without limitation, reporting to Defendants his good faith belief and/or reasonable belief that he and others were being discriminated against based on his/their race/color.

87.     As a result of or/and in retaliation for engaging in one or more protected activities described herein, Defendants retaliated against Plaintiff, including, but not limited to, subjecting Plaintiff to drug testing, suspending him from work without pay, issuing Plaintiff discipline and/or

a write up and terminating his employment, in violation of Title VII of the Civil Rights Act of 1964, as amended in 1991, 42 U.S.C. § 2000 et seq., and 42 U.S.C. § 1981.

88.     All actions or inactions of or by Defendants occurred by and through their agents, servants, or employees acting within the course and scope of their employment, as set forth herein.

89.     As a direct and proximate result of the unlawful conduct of Defendants as set forth herein, Plaintiff has suffered damages including emotional distress, pain and suffering, past and future lost wages and benefits, a detrimental job record, career damage and diminished career potential, mental distress in the form of embarrassment, degradation, humiliation, anxiety, loss of enjoyment of life, loss of sleep, and other nonpecuniary losses. Plaintiff is also entitled to other appropriate equitable relief.

90.     The conduct of Defendants was intentional, malicious, and/or outrageous and evidenced an evil motive or conscious disregard for the rights of Plaintiff and others similarly situated, entitling Plaintiff to an award of punitive damages.

91.     Plaintiff is entitled to recover all his costs, expenses, expert witness fees, and attorneys' fees incurred in this matter as well as other appropriate equitable relief.

**WHEREFORE,** Plaintiff prays for judgment against Defendants for actual, compensatory, and punitive damages, all costs, expenses, expert witness fees and attorneys' fees incurred herein, appropriate equitable relief, for interest at the highest lawful rate, and for such other and further relief as the Court deems just and proper.

## COUNT II - RACE DISCRIMINATION IN VIOLATION OF TITLE VII AND 42 U.S.C. §1981

92.     Plaintiff hereby incorporates by reference into Count II all allegations contained in all preceding paragraphs herein.

13

93.     During Plaintiff's employment with Defendants as set forth above, Defendants subjected Plaintiff to discrimination and disparate treatment based on his race and/or color with respect to his compensation, terms, conditions, and/or privileges of employment in violation of Title VII of the Civil Rights Act of 1964, as amended in 1991, 42 U.S.C. § 2000 et seq., and 42 U.S.C. § 1981.

94.     Plaintiff has a contract for employment as construed pursuant to 42 U.S.C. § 1981 which Defendants violated because of Plaintiff's color and/or race, black/African American.

95.     During Plaintiff's employment with Defendants, Defendants denied Plaintiff the same right to make and enforce contracts and to the full and equal benefits of all laws and proceedings for the security of persons and property as is enjoyed by white citizens in violation of 42 U.S.C. § 1981.

96.     All actions or inactions of or by Defendants occurred by and through their agents, servants, or employees acting within the course and scope of their employment, as set forth herein.

97.     As a direct and proximate result of the unlawful conduct of Defendants as set forth herein, Plaintiff has suffered damages including emotional distress, pain and suffering, past and future lost wages and benefits, a detrimental job record, career damage and diminished career potential, mental distress in the form of embarrassment, degradation, humiliation, anxiety, loss of enjoyment of life, loss of sleep, and other nonpecuniary losses. Plaintiff is also entitled to other appropriate equitable relief.

98.     The conduct of Defendants was intentional, malicious, and/or outrageous and evidenced an evil motive or conscious disregard for the rights of Plaintiff and others similarly situated, entitling Plaintiff to an award of punitive damages.

14

99.     Plaintiff is entitled to recover all his costs, expenses, expert witness fees, and attorneys' fees incurred in this matter as well as other appropriate equitable relief.

**WHEREFORE,** Plaintiff prays for judgment against Defendants for actual, compensatory, and punitive damages, all costs, expenses, expert witness fees and attorneys' fees incurred herein, appropriate equitable relief, for interest at the highest lawful rate, and for such other and further relief as the Court deems just and proper.

## COUNT III – RACIALLY HOSTILE AND OFFENSIVE WORK ENVIRONMENT IN VIOLATION OF TITLE VII

100.     Plaintiff hereby incorporates by reference into Count III all allegations contained in all preceding paragraphs herein.

101.     As set forth above, Plaintiff was subjected to a hostile and offensive work environment because of his race and/or color which he found and which a reasonable person would find to be offensive and which altered the terms and conditions of his employment in violation of Title VII of the Civil Rights Act of 1964, as amended in 1991, 42 U.S.C. § 2000 et seq.

102.     The conduct at issue was engaged in by Plaintiff's supervisors, for which Defendants should be held vicariously liable. Alternatively, to the extent that the conduct at issue was engaged in by non-supervisory employees of Defendants, Defendants knew or should have known about the hostile and abusive work environment, but Defendants failed to take prompt or appropriate remedial or corrective action in response to the hostile and abusive work environment.

103.     All actions or inactions of or by Defendants occurred by or through their agents, servants, or employees acting within the course and scope of their employment, as set forth herein.

104.     As a direct and proximate result of the unlawful conduct of Defendants as set forth herein, Plaintiff has suffered damages including emotional distress, pain and suffering, past and

15

future lost wages and benefits, a detrimental job record, career damage and diminished career potential, mental distress in the form of embarrassment, degradation, humiliation, anxiety, loss of enjoyment of life, loss of sleep, and other nonpecuniary losses. Plaintiff is also entitled to other appropriate equitable relief.

105.    The conduct of Defendants was intentional, malicious, and/or outrageous and evidenced an evil motive or conscious disregard for the rights of Plaintiff and others similarly situated, entitling Plaintiff to an award of punitive damages.

106.    Plaintiff is entitled to recover all his costs, expenses, expert witness fees, and attorneys' fees incurred in this matter as well as other appropriate equitable relief.

**WHEREFORE,** Plaintiff prays for judgment against Defendants for actual, compensatory, and punitive damages, all costs, expenses, expert witness fees and attorneys' fees incurred herein, appropriate equitable relief, for interest at the highest lawful rate, and for such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests a jury trial on all Counts and all allegations contained herein.

## REQUEST FOR PLACE OF TRIAL

Plaintiff hereby requests that the trial of this matter take place in Kansas City, Kansas.

16

Respectfully submitted,

**EMPLOYEE & LABOR LAW GROUP
OF KANSAS CITY, LLC**

By:    /s/Kristi L. Kingston
          Kristi L. Kingston, KS Bar No. 19126
          12920 Metcalf Avenue, Suite 180
          P.O. Box 25843
          Overland Park, KS  66225
          Ph:    (913) 286-5200
          Fax:   (913) 286-5201
          Email: kristi@elgkc.com

**ATTORNEY FOR PLAINTIFF**

17